**MAXTECH CONSUMER PRODUCTS, LTD., Plaintiff,**

**v.**

**ROBERT BOSCH TOOL CORP. and Robert Bosch GmbH, Defendants.**

**15 C 5951**

United States District Court, N.D. Illinois, Eastern Division.

Signed May 18, 2017

---

Paul K. Vickrey, Gretchen Lynne Schmidt, Patrick F. Solon, Vitale, Vickrey, Niro & Gasey LLP, Olivia Luk Bedi, Neal, Gerber .& Eisenberg LLP, Raymond P. Niro, Ryan Kieran Dooley, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Plaintiff.

Alan Norris Salpeter, Dina Marie Hayes, Michelle Kristina Marek, Arnold & Porter Kaye Scholer LLP, Chicago, IL, James S. Blank, Arnold & Porter Kaye Scholer LLP, New York, NY, Paul I. Margulies, Arnold & Porter Kaye Scholer LLP, Washington, DC, Marisa Williams, Arnold & Porter Kaye Scholer, Palo Alto, CA, for Defendant.

### Memorandum Opinion and Order

Judge Gary Feinerman

Maxtech Consumer Products, Ltd., a manufacturer of power tools and related accessories, sued Robert Bosch GmbH ("Bosch GmbH") and Robert Bosch Tool Corp. ("Bosch Tool") (together, "Bosch") for trade secret misappropriation, breach of contract, and fraud, and also for an order amending a Bosch GmbH patent to include a Maxtech engineer as a co-inventor. Doc. 50. A jury trial is set for June 19, 2017. Doc. 209. Bosch has moved for summary judgment on all claims. Doc. 117. The motion is granted in part and denied in part.

### Background

The following facts are set forth as favorably to Maxtech as the record and Lo-

cal Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Bosch objects to several paragraphs of Maxtech's Local Rule 56.1(b)(3)(C) statement of additional facts on the ground that they are insufficiently concise. *E.g.*, Doc. 187 at ¶ 6. None of those objections has merit. Although some paragraphs could have been shorter, that is primarily because Maxtech reproduced relevant deposition testimony in the body of the statement itself, not because it was combining several disparate facts into a single paragraph. And where Maxtech did combine multiple facts in a single paragraph, it did not do so in such a manner as would frustrate the "purpose of Rule 56.1," which "is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Accordingly, Bosch's request to disregard certain paragraphs of Maxtech's Local Rule 56.1(b)(3)(C) statement is denied.

Bosch GmbH is an international business conglomerate based in Germany. Doc. 173 at ¶¶ 2, 14. One of its businesses is the sale of power tools and related products, which it carries on in North America through Bosch Tool, an Illinois-based affiliate. *Id.* at ¶¶ 1–2. Maxtech is a Canadian company that sells power tools and related products in North America. *Id.* at ¶¶ 3–4. Maxtech has sold products to Bosch and to retailers like Home Depot and Lowe's. *Id.* at ¶ 3.

In 2007, Maxtech and Bosch Tool began exploring potential business relationships. *Id.* at ¶¶ 5–7. As part of those efforts, the companies signed a Non–Disclosure Agreement ("NDA") in June 2007. *Id.* at ¶ 5. In late 2008, after Maxtech lost a crucial contract with Home Depot, it hired Drake Pelham as its new Vice President of Sales and tasked him with working on the company's efforts to collaborate with Bosch Tool. *Id.* at ¶¶ 8–9. The parties executed a second, superseding NDA in early 2009. *Id.* at ¶ 10.

This lawsuit concerns three different product collaborations that Maxtech and Bosch explored between 2007 and 2012, involving spade bits, inclinometers, and shell packaging.

## A. Spade Bits

A spade bit is a special type of drill bit that creates a hole with a wider diameter than a conventional drill bit. *Id.* at ¶ 18. In January 2007, Maxtech engineer Satnam Singh designed a new spade bit with a threaded, conical tip and reamers on its sides, which he believed could outperform the then-industry-leading spade bit. Doc. 187 at ¶¶ 2–6. Singh's design allowed the spade bit to work faster than existing technology without sacrificing steadiness of the drill or cleanliness of the bore hole. *Id.* at ¶ 11. His conclusions were memorialized in a drawing supplemented with handwritten notes. Doc. 173–3; Doc. 187 at ¶ 5.

The drawing is undated, but Singh remembers creating it in January 2007, during or immediately after a trip to China, where testing on the new design occurred. Doc. 187 at ¶¶ 2, 5. Maxtech's CEO, Kailash Vasudeva, testified that Singh gave him the drawing in February 2007, at which point Maxtech commissioned a physical prototype. *Id.* at ¶ 6. Singh had no further involvement in the project after giving the drawing to Vasudeva. Doc. 173 at ¶ 131.

Meanwhile, Bosch Tool had begun an effort to develop a "next generation spade bit" of its own, which eventually came to

be known as the "Daredevil" spade bit. *Id.* at ¶ 19; Doc. 187 at ¶ 12. It is undisputed that the Daredevil project was underway at least as early as 2005. Doc. 173 at ¶¶ 40–41. It is also undisputed that the final version of the Daredevil included both a "full-cone threaded tip" and a reamer. *Id.* at ¶ 19; Doc. 187 at ¶ 19. But the parties have different accounts of how the Daredevil project got from Point A to Point B, and they disagree in particular over the point at which the full-cone threaded tip feature came into the picture.

They can agree on at least this much: the two companies arranged a meeting on June 20, 2007 at Bosch Tool's offices in Illinois, where Maxtech made a presentation regarding spade bits. Doc. 187 at ¶ 7. The day before the meeting, the parties executed the 2007 NDA, which protected Maxtech's confidential information—including its "trade secrets, design rights, patent or invention rights, and/or copyrights"—against misappropriation by Bosch. *Id.* at ¶ 8. The 2007 NDA, however, exempted Bosch from liability for using ideas it developed independently. Doc. 173 at ¶ 107. The parties dispute how far along Bosch was in its development of the Daredevil spade bit prior to the June 2007 meeting.

Bosch asserts that it had, well in advance of that meeting, already come up with the ideas that Maxtech alleges were its trade secrets. Doc. 153 at ¶ 39. It points, for example, to documents dated in 2005 that describe a threaded tip, such as an October 2005 "Invention Record" for a "Spade Bit with Cupped Cutting Faces" that "may be threaded or unthreaded" and "may or may not have cutting spurs at the ends" (the latter being a description that roughly fits reamers). *Id.* at ¶¶ 41–42; Doc. 156–5 at 4. Maxtech counters that there is a crucial difference between a "flat" threaded tip and a threaded conical (or "full cone") tip, the utility of which Maxtech claims was its insight. Doc. 173 at ¶¶ 40, 42. Bosch does not disagree, so the heart of the dispute is over when Bosch's threaded tips became conical.

Bosch relies on the testimony of Javier Ibarra, an engineer involved with the Daredevil project, who testified that he and his colleagues had the idea to thread a conical tip by 2005 and had made a prototype with all the features the Daredevil bit would ultimately contain—including a "full cone threaded tip"—by February 2007. Doc. 153 at ¶¶ 43–44; Doc. 154–15 at 5–6, 38–40. Maxtech counters with the testimony of Ken Osberg, a Bosch Tool product manager who was Project Leader for the Daredevil project. Doc. 187 at ¶ 15–16. Osberg testified that putting the full-cone threaded tip on the Daredevil was *his* idea (not, apparently, Ibarra's), although he could not recall when that idea arose. *Ibid.* Also relevant is a Bosch document dated June 18, 2007—two days before the meeting with Maxtech—which reflects the results of earlier "predevelopment" testing for the Daredevil project. Doc. 173 at ¶ 47; Doc. 156–2 at 2. That document has a section entitled, "Next Steps—Final Daredevil Protos." Doc. 156–2 at 6. Four prototypes are listed: "16 TPI," "Small 'zero-rake' 12 TPI," "Small Reamer 12 TPI," and—most pertinent—"Full Cone 12 TPI." Doc. 156–2 at 6; Doc. 173 at ¶ 47. The "Full Cone 12 TPI" prototype is linked to a goal: "Better ease of cut." Doc. 156–2 at 6. A separate section of the document, "Remaining Project Challenges for Daredevil," appears to identify ease of cut as a problem yet to be solved, stating "Full thread—better EOC? Try 14TPI full cone thread." *Ibid.*

All of this evidence, viewed in the light most favorable to Maxtech, shows that Bosch had at least *thought* of using a full-cone threaded tip in advance of the June 20, 2007 meeting with Maxtech, that it was among a handful of options under consid-

eration for the final design of Bosch's new spade bit, and that Bosch had at least some idea of what the benefits of such a design would be. Construing the ambiguities in the June 18 document in Maxtech's favor, however, there is a dispute of material fact over whether Bosch had actually made a physical spade bit with a full-cone threaded tip before June 20.

The June 20 meeting began with all the participants filling a large conference room, after which they broke into smaller "breakout sessions." Doc. 187 at ¶ 9. One of the breakout sessions, which Vasudeva attended for Maxtech, was devoted to power tool accessories, including spade bits. *Id.* at ¶¶ 9, 11. (Bosch disputes this fact because "no Maxtech or Bosch witness, except for Mr. Vasudeva, remembers any 'breakout meetings.'" *Id.* at ¶ 9. So what? Vasudeva testified that this breakout meeting occurred, Doc. 173–6 at 10–13, and Bosch mounts no challenge to the admissibility of his testimony. A jury could, though need not, credit it.) Vasudeva testified that he showed Singh's drawing to the Bosch attendees:

> So breakout meeting, they asked me the questions. Why is it fastest? So I gave the explanation and I also told them that we already had some drawbacks on this one and we already have found a solution and tested it.
>
> And they said what is the solution? *I showed them a drawing Mr. Singh [made] when he was in China, when he was doing the testing. So I showed them that.*

Doc. 173–6 at 19 (emphasis added); Doc. 187 at ¶ 11.

> A: ... [T]hey wanted to know about spade bit, so I explain to them what next generation spade bit we are coming with.
>
> Q: And what specifically did they ask you, sir?

> A: They ask me question about the drawing.... Like why—but you already have the fastest cutting spade bit. Why—why you have to—why you need this? So I explain to them why I'm—why I'm doing this.

Doc. 173–4 at 4; Doc. 187 at ¶ 11. Three Bosch Tool representatives attended that session, though Vasudeva could only identify one—Osberg, who, remember, was leading the Daredevil project—by name. Doc. 187 at ¶ 10.

Bosch denies that Osberg attended the meeting, as does Osberg, and Bosch asserts that documentary evidence proves its position. *Ibid.* But Maxtech produced an Osberg business card bearing his title as of June 2007, which Vasudeva testified he received at the June 20 meeting. Doc. 173–6 at 16–17; Doc. 187 at ¶ 10; Doc. 187–3 at 6–7. That suffices to create a factual dispute over Osberg's attendance at the breakout meeting, which the court at the summary judgment stage must resolve in Maxtech's favor.

Osberg's attendance at the breakout meeting is, in Maxtech's view, a smoking gun connecting Bosch's Daredevil design to Maxtech's insights. Osberg is named as an inventor on Bosch's spade bit patents, which are described in greater detail below, and he testified that "the one geometrical input [he] had on the spade bit was putting a full cone threaded tip on the spade bit." Doc. 173–9 at 5; Doc. 187 at ¶ 15. But Osberg did not personally make any drawings or otherwise document that suggestion, and his background is in marketing, not engineering. *Id.* at ¶¶ 15–16. Osberg testified that he could not remember when he had the idea for the full-cone tip. *Id.* at ¶ 16.

Within a few months of the June 2007 meeting, Bosch became convinced that a full cone threaded tip and a reamer was optimal, and it moved to patent that tech-

nology and bring it to market. Bosch GmbH applied to the United States Patent and Trademark Office for two spade bit patents—No. 7,887,269 ("the '269 patent") and No. 8,262,325 ("the '325 patent")—that incorporate the threaded-tip and reamer innovations. Doc. 173 at ¶ 27. The '269 patent application was filed on October 10, 2007. Doc. 146–7 at 2. The '325 patent application was filed on October 9, 2008. Doc. 146–8 at 2. Both applications were published (and thus made publicly available) on April 16, 2009. Doc. 173 at ¶ 37. The patents were issued to Bosch GmbH in 2011 and 2012, respectively. Doc. 146–7 at 2; Doc. 146–8 at 2. Meanwhile, Bosch began selling the Daredevil spade bit in the United States and Canada on October 1, 2008, and has continuously sold and marketed it ever since. Doc. 173 at ¶¶ 29–30. Between its launch and the end of 2009, the Daredevil generated at least $335,623 in sales. Doc. 173 at ¶¶ 33–34.

Maxtech brought this suit on July 7, 2015. Doc. 1.

### B. Inclinometers

An inclinometer is a device, in this case a digital device, that measures inclines. Doc. 173 at ¶ 20. Inclinometers are also called "levels." *Ibid.*

In 2008, Maxtech began designing a new digital inclinometer that would use an accelerometer-based sensor. Doc. 187 at ¶¶ 44–45. Prominent features of the product that emerged from those efforts included: a bubble level that can measure incline along either one or two axes, calculation of rise and run for measured angles, and—most importantly for present purposes—"a detachable rail that the inclinometer could be locked in to for more accurate measuring." *Id.* at ¶ 46. The new inclinometer had at least thirteen identifiable features: (1) a 2D screen; (2) a selection menu; (3) the detachable digital inclinometer; (4) a "downward angular locking mechanism"

for securing the detachable inclinometer to the rail; (5) "auto calibration of the digital inclinometer when inserted into the rail"; (6) a "floating ball indicator"; (7) an indicator that changed color to identify a level surface; (8) the "use of [an] accelerator to produce a live 2–axis function"; (9) "use of accelerometer center balance technology for both back/side operation and all around measure"; (10) a grade function; (11) a "multiple-memory recall function"; (12) a "hold function for one axis when using [the] second axis"; and (13) "the use of a programmable logic controller chipset" using "ARM chips." *Id.* at ¶ 47.

When asked whether "all of these 13 features [were] not present in any other inclinometer in the market in 2010," Maxtech's Rule 30(b)(6) deponent, Mark Smith, responded, "That is correct." Doc. 187 at ¶ 47. Based on that exchange, Smith could have been testifying either that *each* of the thirteen features was unique in its own right or that the *combination* of all thirteen features was unique. Reading his testimony sensibly and in context, Smith must have meant that only the combination of the thirteen features was unique. The court must draw all reasonable inferences in Maxtech's favor, but one of the thirteen listed features—"a floating ball indicator"—is a standard feature of basic analog levels that Maxtech cannot possibly have believed was unique to its product. The only reasonable inference is that Smith meant that the combination of all thirteen features was unique, but that any individual feature might not have been.

Meanwhile, Bosch had its own inclinometers under development. As of September 2010, there were internal discussions between Steve Angus and other Bosch Tool employees about whether the company should "move ahead" with entering the North American inclinometer market "as soon as possible." *Id.* at ¶ 51. Those discus-

sions prompted Bosch Tool to contact Bosch GmbH in Germany to inquire about the status of inclinometer projects there. *Ibid.* Bosch GmbH reported in an email to Angus that it would soon be launching an inclinometer product known as the "GLM 80." *Id.* at ¶ 52. Angus traveled to Germany later that year, where he discussed the GLM 80 with the lead Bosch GmbH engineer for that project, Heiko Füllemann. Doc. 173 at ¶ 71; Doc. 187 at ¶¶ 52, 70.

The GLM 80 featured an "integrated two-axis 360[ degree] tilt sensor" that could be clipped into an aluminum rail, the R60, which Bosch developed separately as an accessory. Doc. 173 at ¶ 61; Doc. 187 at ¶ 53. The GLM 80 also incorporated a laser rangefinder. Doc. 173 at ¶ 62. Bosch had generated a "Product Concept document" for the GLM 80 at least as early as 2009, and it had developed all of the aforementioned features by April 2010. *Id.* at ¶¶ 60–62. The GLM 80 lacked seven of the Maxtech inclinometer's thirteen features; it did not have, for example, a floating ball indicator, a hold function for one axis when using the second axis, or an indicator that changed colors to indicate a level surface. *Id.* at ¶ 56; Doc. 187 at ¶ 72. The GLM 80 also had a range finder, which Maxtech's prototypes lacked. Doc. 187 at ¶ 71. But the GLM 80 had some key features in common with Maxtech's product, such as the ability to lock to a rail. *Id.* at ¶ 72. According to materials that Bosch GmbH sent to Angus, Bosch planned to bill the GLM 80 as the world's first to combine a laser rangefinder with the integrated two-axis inclinometer feature, as well as the first to combine a laser rangefinder with an aluminum rail. Doc. 174–12 at 17; Doc. 187 at ¶ 53.

In addition to the GLM 80, Bosch during the relevant timeframe developed a separate inclinometer product called the GLM 50C. Doc. 173 at ¶ 21. The GLM 50C lacked the ability to attach to a rail. *Id.* at ¶ 55.

In December 2010, Maxtech pitched its new inclinometer to Angus in hopes that Bosch would agree to sell it under Bosch's brand name. Doc. 187 at ¶ 48. The parties' interactions concerning Maxtech's inclinometer were governed by the 2009 NDA. Doc. 173 at ¶ 116. The 2009 NDA provided in relevant part:

> INDEPENDENT DEVELOPMENTS. Disclosing Party understands that Recipient may develop Confidential Information internally, or receive information from other parties that is similar to the Confidential Information. Accordingly, nothing in this Agreement shall be construed as a representation that Recipient will not independently develop products that compete with products or systems contemplated by the Confidential Information.

*Ibid.* The 2009 NDA contained an integration clause stating that it "contains the entire understanding between the parties regarding the Confidential Information and supersedes all other communications, reports or understandings between the parties in respect thereto." *Id.* at ¶ 118. Under the 2009 NDA, the parties' relationship was that of two "independent contractors"; the parties accordingly agree that the 2009 NDA did not establish any fiduciary or confidential relationship between them. *Id.* at ¶ 117.

Between late 2010 and 2011, Angus met several times with Tim MacKay, the Maxtech engineer who designed its level, and Pelham, the Maxtech sales executive. Doc. 187 at ¶¶ 49, 56. Angus expressed interest in the product on Bosch's behalf and requested refinements in a future prototype, including replacing the laser range-finder then featured on one end of the prototype with laser sights (without range finding capability) on both ends. *Id.* at ¶¶ 49–50.

Angus never informed Maxtech about the GLM 80 project, nor did he notify Maxtech that Bosch had a similar inclinometer already under development. *Id.* at ¶ 55.

On April 20 and/or 21, 2011, Angus met with MacKay and Pelham at Bosch Tool. Doc. 173 at ¶ 66; Doc. 187 at ¶ 56. According to MacKay's notes of the meeting, Maxtech left with "positive" feelings and got the impression that "[m]ost attendees were genuinely looking to push the program internally." Doc. 174–11 at 2. Among the next steps agreed upon was a competitive analysis of the relevant market. Doc. 187 at ¶ 56.

On November 2, 2011, Angus again met with Pelham and MacKay. *Id.* at ¶¶ 57–58. According to MacKay's notes, Angus requested pricing on the Maxtech inclinometer and asked for a "second sample" to be "made right away" with a "[p]roper logo on the membrane switch." *Id.* at ¶ 58. The notes indicate that Angus told MacKay and Pelham that, "to get it approved, [Bosch Tool] need[s] to get Germany's approval" and that Germany "may want to change some things. He mainly said the membrane switch." *Ibid.* Angus informed MacKay and Pelham that Bosch Tool did not want a laser rangefinder included on the inclinometer because "it would encroach on their current product." Doc. 187 at ¶ 50.

On December 8, 2011, Maxtech delivered its second prototype to Bosch Tool. Doc. 187 at ¶ 59. Pelham emailed Angus: "Steve, I left the new Bosch level [at] the front desk with your name on it. . . . Let me know next steps?" Doc. 174–16 at 2; Doc. 187 at ¶ 59. A few days later, Pelham emailed Angus again: "Did you get the NEW BOSCH Level I left there last week . . .? Are you shipping this to Germany? What are the next steps?" Doc. 174–16 at 2; Doc. 187 at ¶ 59. Angus responded on December 13: "Yes, I got the digital level,

I will play with this for a while before sending to Germany." Doc. 187 at ¶ 59.

Later that month, Pelham sent the following report to Vasudeva about the inclinometer discussions with Bosch:

Steve [Angus] has shipped this new sample to the German final decision maker and he received it this past few weeks and with the holidays he has not gotten back to Steve in Chicago. They will be attending the Cologne Fair and as Steve said hopefully a decision will be made before this but if not, he will go there as well and suggest that I also go if the answer has not been finalized before. The team in the U.S. really like the item and are pleased by the vast improvements. The proposed units for a year is at around 5–6,000 to start. Then Europe hopefully will jump on it as well.

*Id.* at ¶ 60. In its Local Rule 56.1(b)(3)(B) response, Bosch contends that Maxtech has no documentary evidence to corroborate the assertions in Pelham's report and notes that Angus recalls events differently. *Ibid.* Those objections are irrelevant for summary judgment purposes. Assuming that Pelham's report is itself relevant and admissible, the court—resolving all disputes of fact and drawing reasonable inferences in Maxtech's favor—must credit it.

As to the report's admissibility, Bosch contends that "Pelham, as a Maxtech employee, could have no personal knowledge regarding whether Bosch Tool actually relayed the inclinometer sample to Bosch GmbH." Doc. 152 at 23. But Pelham had personal knowledge of what Angus *told* him. That matters both because Maxtech's fraud claim does not turn on the truth of Angus's statements (it is, in fact, premised on their falsehood), and because Angus's statements were those of a party opponent, and thus admissible in any event. *See* Fed. R. Evid. 801(d)(2)(D) (defining as "not hearsay" any statement "offered

against the opposing party and ... made by the party's agent or employee on a matter within the scope of that relationship"). As for Pelham's report as a whole, it appears to be admissible under the business records exception to the hearsay rule, *see* Fed. R. Evid. 803(6), and Bosch has not contended otherwise. The court therefore concludes for summary judgment purposes that, sometime in mid-to-late December 2011, Angus told Pelham that Bosch Tool employees were enthusiastic about Maxtech's inclinometer product, that Bosch Tool had sent Maxtech's second prototype to Germany, and that Bosch GmbH officials were in the midst of deciding whether to sign off on selling Maxtech's product.

In fact, Angus never sent any Maxtech prototype to Germany. Doc. 187 at ¶ 68. The only prototype he recalls receiving—he did not recall a second—remained in his office. Doc. 174–10 at 27–28; Doc. 187 at ¶ 68. Angus testified that he never discussed Maxtech or its prototype with anyone in Germany. Doc. 173 at ¶ 73; Doc. 174–10 at 27–28; Doc. 187 at ¶¶ 68–69.

Meanwhile, sales of Bosch's GLM 80 inclinometer ramped up in 2011. In April 2011, the GLM 80 launched in Germany. Doc. 173 at ¶ 63. Bosch sold 65,420 units of the GLM 80 in Europe and Asia in 2011 and 102,083 units in 2012. Doc. 187 at ¶ 71. Bosch began selling the GLM 80 in North America sometime later in the year. Doc. 173 at ¶ 63.

On February 7, 2012, Pelham emailed Angus to follow up about the Maxtech inclinometer: "Steve, I know you are busy but can we meet, discuss where we are with the NEW proposed Bosch Level? I had dropped off a new sample to be sent to Germany. Any news on getting this approved?" Doc. 187 at ¶ 61. A meeting between Angus and Pelham followed on February 9; it is unclear from the record what was discussed. *Ibid.* In June 2012, Pelham followed up again, saying that Maxtech "ha[d] been holding this for Bosch as an exclusive item for over a year and ... would like to move forward." Doc. *Id.* at ¶ 62. On July 31, 2012, Pelham sent a similar email: "Can we please discuss the proposed Bosch 24[-inch] Level that we have been working on for over a year? We as discussed agreed to hold this as EXCLUSIVE for you, Bosch." Doc. 187 at ¶ 63. (Neither party contends that the parties agreed to exclusivity. Maxtech *offered* exclusivity to Bosch, Doc. 173 at ¶ 123, but Bosch neither requested it nor accepted Maxtech's offer, *id.* at ¶¶ 122, 125.)

On August 20, 2012, Pelham met with Bosch Tool executive Wayne Thomsen about the inclinometer. Doc. 187 at ¶ 64. Pelham's notes reflect that Thomsen "liked what he saw" and that Angus would follow up with Pelham within "the next few weeks." *Id.* at ¶ 64.

Pelham followed up again in an October 30, 2012 email to Thomsen and Angus: "I have been holding this as an exclusive item for Bosch and Steve has been given two different samples. Please advise as to when we can meet and discuss?" *Id.* at ¶ 65. Angus replied that Bosch was not interested: "As I mentioned previously, lead for this category is in Germany. The team has decided to move in a different direction and has passed on this concept." *Ibid.* Angus also asked for an address to ship back Maxtech's prototypes. *Ibid.*

Although Angus's October 2012 email refers to a "team," he testified at his deposition that the decision not to pursue the level project with Maxtech rested with him alone. *Id.* at ¶ 69 ("Q: ... [W]ho was part of that team? Identify everybody. A: Myself. Q: You were the team? A: I'm the team."). Angus could not remember when he made the decision not to move forward with the Maxtech level. *Ibid.*

## C. Shell Packaging

Maxtech's third set of claims concerns certain details of its process for making a type of retail packaging for tools and tool accessories that it calls "shell pack" or "shell packaging." Doc. 173 at ¶ 23. In February 2011, Bosch asked whether Maxtech would be able to develop a new, improved type of packaging for drill bits and similar accessories. Doc. 187 at ¶ 25. Bosch was impressed with packaging introduced by one of its small European competitors and wanted to develop a similar package for its own products. *Ibid.* The packaging Bosch wanted to develop was to be entirely plastic; in other words, the product was to be sealed between two sheets of plastic, with no paper or cardboard elements, making it fully recyclable. Doc. 153–1 at 26–27; Doc. 154–9 at 3–4; Doc. 173 at ¶ 23. At the same time, the packaging needed to embed a "Sensormatic" security tag commonly required by North American retailers between the two sheets of plastic. Doc. 154–9 at 3–4; Doc. 173 at ¶ 23.

Allen Pendergraph, a then-Bosch employee involved with the packaging project, described these dual goals as follows:

A: And this was a unique plastic-on-plastic packaging system which was supposed to meet the needs of the North American retailers for security and also meet the economic realities of the marketplace.

Q: You said it was a unique packaging system. How did it differ from normal packaging?

A: Just thin plastic on plastic. Traditionally, there's several types of what I will call retail packaging where you're able to visually see the product. Traditionally, it's made with a rigid plastic or very thin skin film. And both of those are either applied to a paperboard, and occasionally there's a paperboard encased in two sheets of plastic.

What we were trying to do is minimize the materials, meet the security requirements of the large retailers, such as Home Depot and Lowe's, and, of course, have an attractive package in the marketplace that was cost-effective.

Doc. 154–9 at 3. As Pendergraph explained, the ability both to incorporate the Sensormatic tag and to produce an all-plastic, no-paper product would enable Bosch to use the same packaging in both Europe and North America:

A: Shell packaging was very unique. We found a sample in the European marketplace with a small drill company where they had done almost a similar type of setup. The security of the package wasn't what was required for North America.

When we saw this package, we started to develop kind of the next generation, next version, next level of technology so we could incorporate a common security device that's used in North America, which is the Sensormatic electronic security tag.

Q: What did you perceive as some of the advantages to the shell packaging over the normal packaging?

A: We were trying to get, as Bosch always does, to a global platform on a package. And the problem we have in Europe is that when you mix materials with a traditional skin pack or face seal blister, there is residue from the paperboard left on the plastic, and it renders it incapable of being quickly and cost-effectively recycled.

So we were looking to do plastic on plastic where the whole package was recyclable.

Doc. 154–9 at 3–4. According to Pendergraph, Bosch envisioned using Maxtech as a "process laboratory" to develop its new packaging concept, in part because Maxtech was smaller and more "nimble" and

thus could develop the concept more rapidly than Bosch could. Doc. 187 at ¶¶ 25–26. Maxtech spent about a year and a half of trial-and-error refining a packaging process that it hoped would meet Bosch's specifications. *Id.* at ¶ 27.

Despite enlisting Maxtech to take on this project, Bosch never seriously considered having Maxtech actually supply it with packaging. *Id.* at ¶ 40. Maxtech asserts that Bosch misled it into thinking it was a candidate to receive Bosch's packaging business if it succeeded, but the only evidence it cites is a Maxtech employee's testimony that he "[could not] recall if . . . [Bosch] discussed potential business" with Maxtech, Doc. 174–5 at 3; Doc. 187 at ¶ 39, which needless to say does not support the assertion. The reasonable inference is that Maxtech *hoped* it could woo Bosch as a business partner by rising to Bosch's challenge and developing the novel technology Bosch sought, but that Bosch did not *promise* Maxtech any packaging business, nor did it ever represent that it was actively considering enlisting Maxtech as a packaging supplier.

As with the inclinometer discussions, the 2009 NDA governed Maxtech's dealings with Bosch concerning the shell packaging process. Doc. 173 at ¶ 83. Under the 2009 NDA, it was Maxtech's obligation to give clear notice to Bosch of which information was confidential. *Id.* at ¶ 84. The relevant provisions stated:

2. IDENTIFICATION. Information considered Confidential Information by Disclosing Party shall be clearly marked as 'Confidential' or 'Proprietary' or in a similar manner by Disclosing Party.

3. FORM OF DISCLOSURE. Confidential Information that is disclosed orally, visually, or in some other form not permanently recorded shall be considered Confidential Information if it is identified as Confidential Information in

writing by Disclosing Party within thirty (30) days after disclosure to Recipient. *Id.* at ¶ 85.

On several occasions, Pendergraph and (on one occasion) an unnamed Bosch employee visited the facility in China where Maxtech was developing the shell pack process. Doc. 187 at ¶ 28. Maxtech employees showed or explained to Pendergraph all the steps and machinery in the process, including which among them were succeeding in meeting specifications and which were not. *Ibid.*

Meanwhile, Bosch instructed Pendergraph to sign and submit two patent applications, the first of which was filed in March 2013. *Id.* at ¶ 33; Doc 105–1 at 2; Doc. 105–2 at 2. (Maxtech had filed its own patent application describing its shell pack process in January 2013. Doc. 105–3 at 2.) Pendergraph was uncomfortable receiving sole credit for the patent applications, and complained internally, because he "thought that Maxtech had had a great deal of input on this" and that Bosch "should have acknowledged" Maxtech's contributions. Doc. 187 at ¶ 34. Pendergraph thought the patent process was "highly unusual"; he typically would prepare his own patent applications, but in this case another Bosch employee drafted the application, and Pendergraph was asked only to sign it. *Id.* at ¶ 35. Bosch later fired Pendergraph. *Id.* at ¶ 36.

At least one of Pendergraph's visits to Maxtech's packaging facility came after Bosch filed the patent applications. *Id.* at ¶ 41. At that time, Pendergraph was instructed to "review 'technical issues'" with Maxtech and "gather information on process" but not to discuss the applications. *Ibid.* According to Rick McPhee, another Bosch employee who was involved in preparing Pendergraph for the visit, the instruction to "gather information on process" was part of Bosch's effort to learn

more about "the timing of the process" in order to help Bosch calculate how much the Maxtech-developed packaging would cost. *Ibid.*; Doc. 187–14 at 11.

According to Pendergraph, once Maxtech had refined its process to the point where it satisfied Bosch's goals regarding "packaging performance, packaging appearance, and the ability to include a Sensormatic security tag," Bosch GmbH "stepped in and took over" the project from Maxtech. Doc. 174 at 13–14; Doc. 187 at ¶ 30. The parties disagree whether Maxtech's process had proven "successful" at this point. Doc. 187 at ¶ 30. This is a dispute of semantics, not fact. Maxtech points to unrebutted testimony by Pendergraph that Maxtech's process met the aforementioned performance goals, while Bosch points to unrebutted testimony by Pendergraph that the shell pack process—as least as Maxtech developed it—was "not economically viable" because its "overall cost . . . did not meet [Bosch's] needs." Doc. 187 at ¶ 30; Doc. 187–12 at 11–12. These assertions are consistent with one another: Maxtech's process could work very well while also being more expensive than Bosch wanted. The parties also dispute what became of Maxtech's process once Bosch took the reins—more on this later—but, in essence, Bosch contends that it abandoned the project entirely because it was too expensive, while Maxtech contends that aspects of its process found their way into the packaging Bosch now uses. It is, however, undisputed that the packaging Bosch uses today is known to the company as "cocoon" packaging, not "shell pack," Doc. 173 at ¶ 24, and that it differs in major respects from the packaging Maxtech developed: it is plastic-on-cardboard packaging, not plastic-on-plastic, Doc 154–10 at 6, 11–12; Doc. 173 at ¶¶ 24, 96, and it does not encase the sensormatic tag into the packing itself, Doc. 154–9 at 3–4; Doc. 154–10 at 5, 13; Doc. 173 at ¶ 24.

## Discussion

## I. Spade Bit Claims

Maxtech brings three separate claims related to the spade bit. First, it asserts a correction of inventorship claim, which seeks to have Singh added to Bosch's spade bit patents. *See* 35 U.S.C. § 256 (providing that when "through error a person is not named in an issued patent," a "court before which such matter is called in question may order correction of the patent"). Second, Maxtech asserts that the inclusion of a threaded, conical tip and reamers on a spade bit was a trade secret that Bosch misappropriated for use in its own competing product. Doc. 126–1 at 15–16; Doc. 173 at ¶ 26; Doc. 173–2 at 17. Third, Maxtech claims that the misappropriation constituted a breach of the 2007 NDA.

### A. Correction of Inventorship Claim

To prevail on its § 256 correction of inventorship claim, Maxtech must prove by clear and convincing evidence that Singh contributed enough to Bosch's conception of the Daredevil spade bit design to merit inclusion as a co-inventor. *See Meng v. Chu*, 643 Fed.Appx. 990, 994 (Fed. Cir. 2016); *Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014). To merit correction of inventorship, the alleged co-inventor must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). Maxtech must also provide corroborating evidence of Singh's co-inventorship above and beyond his own testimony, with

the sufficiency of the corroboration evaluated under a "rule of reason" analysis. *See Meng*, 643 Fed.Appx. at 994; *Gen. Elec. Co.*, 750 F.3d at 1330; *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1348 (Fed. Cir. 2013).

Bosch makes three arguments for why Maxtech's claim falls short: (1) Maxtech has failed to provide adequate corroboration; (2) Maxtech has failed to demonstrate that Singh and the Bosch named inventors meaningfully collaborated; and (3) the undisputed evidence shows that Bosch had already invented the relevant spade bit design before the parties' June 20, 2007 meeting—in other words, that it independently developed the invention. Doc. 152 at 40–45. It suffices to discuss only the second and third arguments, each of which independently defeats the correction of inventorship claim.

■ *1. Collaboration.* Joint inventorship under § 256 requires "at least some quantum of collaboration or connection" between the listed inventors and the claimed co-inventor. *Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992); *see also Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("[T]he alleged joint inventor seeking to be listed on a patent must demonstrate that his labors were conjoined with the efforts of the named inventors."). Inventors "need not physically work together," but they must have "some open line of communication during or in temporal proximity to their inventive efforts." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 776 F.3d 837, 846 (Fed. Cir. 2015) (internal quotation marks omitted). This "element of joint behavior" could be demonstrated by "collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." *Kimberly–Clark*, 973 F.2d at 917.

■ Here, Singh and the named Bosch inventors did not collaborate in any traditional sense, as they never even met. Rather, Vasudeva showed Singh's spade bit drawing to Bosch and explained what Maxtech had found to be the benefits of its design. *Kimberly–Clark* holds that sufficient collaboration might occur where one inventor builds off of another's "report." *Ibid.* But *Kimberly–Clark* sheds no light on *when* merely having been informed of another's work suffices, because the putative joint inventors there were "completely ignorant of what each other ha[d] done." *Ibid.*; *see also Univ. of Utah v. Max–Planck–Gesellschaft Zur Foerderung Der Wissenschaften e.V.*, 134 F.Supp.3d 576, 586 (D. Mass. 2015) ("*Kimberly–Clark* does not stand for the proposition that building upon a relevant report on its own rises to the level of collaboration ....").

More helpful on that question is *Rubin v. General Hospital Corp.*, 523 Fed.Appx. 719 (Fed. Cir. 2013). In *Rubin*, two teams of medical researchers were working independently to identify the genetic mutations that cause a heritable disease. *Id.* at 721. The first team ("Team A") identified two such mutations, and submitted a manuscript to a journal describing their findings, an abstract of which the journal's editors inadvertently sent for peer review to a member of the second team ("Team B"). *Ibid.* At the time it received the abstract, Team B "had found a multitude of mutations" that "included the correct major and minor mutations," but the plaintiffs—the researchers from Team A—argued that having access to their report helped Team B "finally identify the operative ... mutations from among the many mutations that they had found," making the two teams joint inventors under *Kimberly–Clark. Id.* at 722–23, (internal quotation marks omitted). The Federal Circuit disagreed, holding that "the independent relationship between these teams of scien-

tists, and the nature of this communication of information, do not support joint invention." *Id.* at 723. Instead, "ultimately the dispute [was] of priority of invention" between the two rival teams. *Ibid.*

Maxtech likewise has not shown sufficient collaboration between Singh and the Daredevil inventors. Although, unlike in *Rubin*, the transmission of Singh's drawing to his Bosch counterparts was neither inadvertent nor unsolicited, it did similarly occur through an intermediary, Vasudeva. Moreover, by the time of the transmission, the Bosch team had conceived of the full-cone-and-reamer design depicted in Singh's drawing, which was one of only a handful it was considering, and had some idea of its likely benefits. So the Singh drawing offered less help to the Bosch inventors than Team A's report offered in *Rubin*, if it offered any at all. As in *Rubin*, then, any dispute over patent rights here would be in the nature of two teams of independent inventors competing to establish priority of invention. But Maxtech mounts no priority of invention or other challenge to Bosch's patent, nor has it shown that it ever attempted to seek a patent based on Singh's work, so the conclusion that Singh did not collaborate with the Bosch inventors suffices to resolve the parties' dispute. Singh's only contribution was a single drawing (and an accompanying explanation of its benefits) that was conveyed to his alleged co-inventors, and the undisputed evidence shows that this exchange either added nothing to an idea the named inventors already had or was, at best, marginally helpful in realizing its benefits. *See Nartron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352, 1357 (Fed. Cir. 2009) (holding for purposes of a correction of inventorship claim that an alleged co-inventor's contribution must be "not insignificant in quality"); *Pannu*, 155 F.3d at 1351 (same); *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1230 (Fed. Cir. 1994) (rejecting a correction of inven-

torship claim where the putative co-inventors' test results "simply confirm[ed] the operability" of the named inventor's drug). Accordingly, Maxtech has failed to carry its burden of showing sufficient collaboration. *See Univ. of Utah*, 134 F.Supp.3d at 586 (holding that the fact that the named inventor "read [the alleged collaborator's] minireview before it was published does not itself amount to collaboration").

*2. Independent Development.* Bosch also contends that Maxtech's correction of inventorship claim fails because Bosch independently developed the full-cone threaded tip and reamer spade bit idea before its June 20, 2007 meeting with Maxtech. Doc. 152 at 40. This issue turns on the question of when Bosch had the idea for the technology. In *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, supra, the Federal Circuit explained that for correction of inventorship claims, the "touchstone" is the moment of "conception"—in other words, "the completion of the mental part of invention." 40 F.3d at 1227–28; *see also Wilkins*, 750 F.3d at 1332 (holding that there was no joint inventorship where the named inventors "had already conceived of their ... solution before corresponding with" the putative co-inventor); *Kimberly–Clark*, 973 F.2d at 916 ("To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution *to the inventive thought* and to the final result.") (emphasis added). The pertinent question is when the named inventors arrived at "an idea that was definite and permanent enough that one skilled in the art could understand the invention." *Burroughs Wellcome*, 40 F.3d at 1228. "[A]n inventor need not know that his invention will work for conception to be complete. He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice." *Ibid.* (citation omitted). Maxtech

appears to agree that the issue is when Bosch conceived of the idea of using a full-cone threaded tip and reamer, not when it made a prototype or otherwise finalized its invention. Doc. 172 at 48 (arguing that summary judgment is inappropriate because it was Osberg who allegedly came up with the full-cone design for Bosch, and "there are not documents showing when he conceived of that").

Bosch has established independent development because the undisputed evidence shows that it at least had the *idea* to use a full-cone threaded tip in its product in advance of the June 20, 2007 meeting. Even if a jury were to disbelieve Ibarra's testimony that he invented the full-cone version in February 2007, Bosch's June 18, 2007 product sheet makes clear that the idea was already circulating within Bosch by twice referring to the possibility of using a full cone threaded tip, Doc. 156–2 at 6, and by accurately predicting the design's benefits as well, *compare ibid.* (predicting "[b]etter ease of cut"), *with* Doc. 173–6 at 109 (Vasudeva explaining that, prior to Singh's breakthrough, Maxtech's spade bit "was so fast that when it was going through the hole . . . if the person is tired, it may jerk his hand and hurt himself. So Mr. Singh worked for two years . . . especially how to slow it down and how to make the hole cleaner."). It is immaterial that a jury might believe Bosch had not yet updated its prototype to physically embody the new design, or that Bosch was also considering a handful of other possible designs.

Maxtech—mistakenly asserting that there is "no evidence" of Bosch's prior conception, Doc. 156–2 at 6—does not argue otherwise. And Maxtech's reliance on Osberg's testimony that he was the inventor and "could not remember when he allegedly conceived the full cone threaded tip," Doc. 172 at 35, does not create an issue for the jury. The June 18 product sheet is unrebutted evidence that the conception of the idea within Bosch—whether by Osberg or someone else—took place before the June 20 meeting, and Osberg's testimony that he cannot recall the date of his conception is not evidence to the contrary. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011) ("While [the non-movant plaintiff] testified that he could not recall when or whether he told Sheahan about the background check, Sheahan testified under oath that he did not learn of the background check until July 31, 2006. Because [the non-movant plaintiff]'s testimony is inconclusive, it cannot by itself create a genuine factual dispute."); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002) ("[The non-movant plaintiff]'s only evidence that she never received notice of the program was her own affidavit in which she avers that she 'does not recall seeing or reviewing the Arbitration Program brochure that Defendant alleges was included with her payroll check in October, 1997,' and this does not raise a genuine issue of material fact."). The undisputed evidence shows that Bosch's date of conception—whatever it was—must have been before June 18, 2007. It follows that Maxtech cannot satisfy the third element of its correction of inventorship claim.

### B. Trade Secrets Claim

As noted, Maxtech claims that Bosch's incorporation of a reamer and full-cone threaded tip into its Daredevil spade bit constituted misappropriation of the trade secrets that Maxtech disclosed at the June 20, 2007 meeting. To establish a trade secret misappropriation claim under Illinois law, "the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721

(7th Cir. 2003). "The Illinois Supreme Court has defined a trade secret as 'a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it.'" *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987).

Bosch offers two grounds for summary judgment on this claim—the statute of limitations, and independent development. Both grounds have merit, and each independently defeats the claim.

■ *1. Statute of Limitations.* Bosch contends that Maxtech's spade bit trade secret claim is barred by the statute of limitations. Doc. 152 at 13–16. In Illinois, a plaintiff must bring a claim for trade secret misappropriation "within 5 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." 765 ILCS 1065/7; *see also Research Res., Inc. v. Dawn Food Prods., Inc.*, 2001 WL 1223556, at *7 (N.D. Ill. Oct. 11, 2001). In other words, the action must be brought within five years after the plaintiff had either actual or constructive notice of the defendant's alleged misappropriation. Because Maxtech filed this suit in July 2015, the issue is whether Maxtech was on actual or constructive notice of Bosch's use of its technology in the Daredevil bit prior to July 2010.

■ There is no need to address actual notice because Maxtech indisputably had at least constructive notice before 2010. In determining when Maxtech had constructive notice, the court must be careful not to resolve factual disputes, *see Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311, 1318 (Fed. Cir. 2012), but the question may be decided on summary judgment if the undisputed facts leave no doubt that Maxtech's failure to discover Bosch's use of its spade bit technology sooner was unreasonable, *see General Bed-ding Corp. v. Echevarria*, 947 F.2d 1395, 1398–99 (9th Cir. 1991) ("[S]ome cases have decided the issue of constructive notice as a matter of law."). Bosch identifies two sources of constructive notice. First, Bosch notes that it marketed the Daredevil bit in North America starting in October 2008 and contends that Maxtech, as Bosch's direct North American competitor, should have been keeping abreast of its product offerings. Doc. 152 at 14–15. Second, Bosch points to the Daredevil patent applications, both of which were published and became matters of public record in April 2009. Doc. 152 at 16. The second argument wins the day for Bosch, and the first provides additional, albeit unnecessary, support.

Although publication of a patent application does not *invariably* put a trade secret plaintiff on constructive notice of misappropriation, *see Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.*, 2009 WL 2567022, at *5 (D. Del. Aug. 19, 2009); *Micrel Inc. v. Monolithic Power Sys., Inc.*, 2005 WL 6426678, at *4 (N.D. Cal. Dec. 9, 2005), under the circumstances present here Bosch's patent applications did. The applications, which were published in April 2009, made it obvious that Bosch was attempting to patent the exact same technology Maxtech had described to Bosch at the June 20, 2007 meeting, and Bosch's attempts to do so—recall that its patent applications were filed in October 2007 and October 2008—took place relatively shortly that meeting occurred. *See Micrel*, 2005 WL 6426678, at *6 (holding that "the relatively short time period" between a former employee quitting his job with the plaintiff and his filing for a patent, combined with the fact that the patent "specifically state[d] that it is a modification of [the plaintiff]'s prior invention," meant that the recording of the patent put the plaintiff on constructive notice of the employee's potential theft of its trade secrets). No rea-

sonable jury could excuse Maxtech's failure to keep abreast of its competitors' patent filings. Maxtech around the same time was prosecuting multiple patents of its own for various power tool accessories generally, as well as a trademark application for spade bit products specifically. *See, e.g.,* U.S. Trademark No. 3,902,720 (reproduced at Doc. 183–1); U.S. Patent No. 7,726,479 (reproduced at Doc. 183–2). So at the time Bosch's patent applications were published, Maxtech was "an inventor actively practicing in the field" and "prosecuting [its] own patent application[s]" for related technology, and thus could be expected to keep abreast of its competitors' patent filings. *Wang v. Palo Alto Networks, Inc.,* 2014 WL 1410346, at *6 (N.D. Cal. Apr. 11, 2014).

In *Wang,* one former business partner, Qiang Wang, sued another, Fengmin Gong, for misappropriating proprietary firewall technology. *Id.* at *1. Wang had disclosed his secrets to Gong subject to an NDA, in order to explore commercializing his technology with Gong. *Id.* at *1–2. The partnership never materialized, and Gong took a job at Palo Alto Networks, which was a competitor of Wang's in the firewall technology space. *Id.* at *2–3. About six months later, Gong and several others filed a patent application that allegedly reflected Wang's ideas, which was published later the same year. *Id.* at *3. While all of this was happening, Wang was actively trying to commercialize the technology himself, "monitoring Palo Alto Networks as a competitor" and "prosecuting his own patent application in the same field." *Id.* at *3, 6. Given these facts, the court held that Wang was on constructive notice of Gong's patent application, reasoning that "publication of patents (and now patent applications) must be deemed, as a matter of law, to place those practicing in the same field and prosecuting their own patent applications in the same field on full notice of all of the contents of the publication." *Id.* at

*6. That was all the more true because it was "crystal clear ... that the contents of [Gong's] patent application revealed the alleged trade secrets in question." *Ibid.*

Although there is a division of authority on the questions whether and when a published patent application can start the clock running on a statute of limitations, *see Ferris Mfg. Corp. v. Carr,* 2015 WL 279355, at *3 (N.D. Ill. Jan. 21, 2015) (collecting cases), the court finds *Wang* to be persuasive and on-point. As in *Wang,* Maxtech was actively developing its own spade bit product, regularly engaged in the patent prosecution process for its other designs, and considered Bosch—on whose behalf the patent applications were filed—a competitor in the same space; it therefore had no good reason not to periodically check for relevant filings. Moreover, the nature of the technology at issue is such that it would have been obvious that the patent applications depicted the design that Maxtech claims was its secret. Under circumstances such as these, a published patent application does put a plaintiff on constructive notice of a trade secret misappropriation claim.

The fact that Bosch took its spade bit to market in late 2008 reinforces the conclusion that Maxtech should have been aware that Bosch had adopted its technology. *See Raza v. Siemens Med. Solutions USA Inc.,* 607 F.Supp.2d 689, 693 (D. Del. 2009) ("Courts have recognized that public disclosure of products, as well as publicly noticed filing of patent protection constitutes, at a minimum, constructive knowledge for purposes of discovering a claim based on the misappropriation of trade secrets ...."). Maxtech asks the court disregard Bosch's marketing of the Daredevil spade bit prior to 2010 by pointing out that Bosch did not exhibit the Daredevil at two particular "hardware shows." Doc. 173 at ¶ 30. But any marketing strategies that

Bosch failed to pursue do not negate evidence of Bosch's marketing that *did* occur, such as touting the Daredevil spade bit (and its "full cone threaded tip" and "patented spur and reamer design") in an October 2008 press release, Doc. 146–9, offering it for purchase through Amazon.com, Doc. 146–11 (including customer reviews dated Oct. 20, 2009, Mar. 4, 2009, and Dec. 29, 2008), and garnering coverage from tool-focused web sites and publications in late 2008 and 2009, Doc. 147–2 (Tool-Snob.com, July 24, 2009); Doc. 147–3 (Popular Woodworking Magazine, Oct. 10, 2008); Doc. 148–1 (Tool–Rank.com, Oct. 27, 2008). Maxtech also asserts that Home Depot did not begin selling the Daredevil until early 2013 and that the woodworking celebrity Bob Vila named it among his "Top Tools 2012." Doc. 173 at ¶ 30. Those facts are similarly irrelevant to the question whether other outlets sold the product, or other marketing occurred, prior to 2010.

Finally, Maxtech cites a Bosch document describing a 2010 product "relaunch" for the Daredevil. Doc. 173 at ¶ 30. But that document clarifies that "[i]n 2010, the brand team helped provide a complete relaunch of the Bosch daredevil *branding*, leading to several packaging, merchandising and microsite design awards ... to help create user demand that lead to double digit growth the brand has experienced since." Doc. 146–10 at 2 (emphasis added). The document thus makes clear that existing Daredevil technology was already being "packag[ed]" and "merchandis[ed]" before 2010—gaining enough awareness among consumers, at least, to require a *re*launch of the brand. The fact that Bosch was actively marketing its product in 2008 and 2009 is added reason to conclude that Maxtech indisputably could have and should have discovered that Bosch was using its design at some point before July 2010.

In a last-ditch effort to resuscitate its otherwise time-barred claim, Maxtech seeks equitable tolling under the doctrine of "fraudulent concealment," relying on Bosch's alleged assurances, once confronted by Maxtech, that it had independently developed the relevant technology. Doc. 172 at 32–34. But even if Bosch made such assurances, and even if such assurances could form an adequate basis for tolling the statute of limitations on concealment grounds, Maxtech's argument still fails because Maxtech's complaint did not plead Bosch's allegedly fraudulent representations regarding its independent development of the Daredevil. Pleading fraudulent concealment at the outset is a necessary prerequisite to countering a summary judgment motion on equitable tolling/fraudulent concealment grounds. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) ("[F]ederal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment.") (collecting cases); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) (holding that tolling on fraudulent concealment grounds was unavailable where the plaintiff "failed to plead fraud or concealment (*i.e.*, fraudulent concealment), and raised the issue for the first time in his opposition to [the defendant]'s cross-motion for summary judgment"). Maxtech has raised this issue too late.

■ *2. Independent Development.* Bosch also argues that Maxtech's trade secret claim falters on independent development grounds. The parties' briefs do not distinguish between independent development in the correction of inventorship context and independent development

in the trade secrets context. Doc. 152 at 40; Doc. 172 at 48. In particular, Maxtech offers no argument that reduction to practice is necessary to establish independent development in the trade secrets context. Requiring only conception to establish independent development is also consonant with the nature of the particular trade secret claim being made here; Maxtech's alleged trade secret was not some secret means of *making* a full-cone threaded tip, but simply the *idea* to use one on a spade bit in combination with a reamer in order to improve performance. Bosch has established that it already had that idea before it learned about Maxtech's own inventive efforts. The court therefore concludes that Bosch has established independent development sufficient to defeat Maxtech's trade secrets claim.

## C. Breach of Contract Claim

Any misappropriation of Maxtech's spade bit trade secrets would have constituted a breach of the 2007 NDA. Bosch asserts independent development as a basis for dismissing the contract claim, for the same reasons it is a basis for dismissing the trade secrets misappropriation claim. Doc. 152 at 30–31. Because Maxtech agrees that the breach of contract claim turns on the same arguments as the trade secret claim, Doc. 172 at 46, and in particular because it has conceded that the 2007 NDA exempted Bosch from liability for using independently developed information, Doc. 173 at ¶ 107, summary judgment is warranted on this claim as well.

## II. Inclinometer Claims

Maxtech brings three inclinometer-related claims. First, Maxtech claims that Bosch misappropriated its trade secrets by using them in one of its inclinometer products. Second, Maxtech claims that, in so doing, Bosch breached the 2009 NDA. Finally, Maxtech claims that Bosch committed fraud by misleading Maxtech about its interest in selling Maxtech's inclinometer, when in fact it was planning to launch a similar product of its own and was not seriously considering doing business with Maxtech.

## A. Trade Secrets Claim

Bosch contends that Maxtech has failed to adduce any evidence of trade secret misappropriation with respect to its inclinometer technology. Although Maxtech initially claimed that several of Bosch's inclinometer products embodied its trade secrets, Maxtech now focuses on a single Bosch inclinometer, the GLM 50C, as its counsel confirmed:

> THE COURT: Bosch did say in its reply brief that Maxtech is not defending the trade secret claim—I'm not talking about the fraud claim—the trade secret claim as to the GLM 80, the GLM 100 and the R 60. Do you agree with that?
> PLAINTIFF'S COUNSEL: That's correct, your Honor.
> THE COURT: So, all we're talking about for the trade secret claim is the GLM 50?
> PLAINTIFF'S COUNSEL: That's correct.

Maxtech claims that seven of the thirteen features present in its inclinometer prototype are also present in Bosch's GLM 50C, among them such innocuous items as a "2D screen" and a "floating ball indicator." Doc. 172 at 40. Six are not. Given all this, Bosch contends that the GLM 50C lacks crucial features essential to Maxtech's technology and so cannot embody Maxtech's trade secret. Doc. 152 at 21–22.

As a threshold matter, a trade secret plaintiff must define the allegedly misappropriated secrets with sufficient specificity. This requires identifying "concrete secrets" that the defendant allegedly misappropriated. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d

1263, 1266 (7th Cir. 1992); *see also AMP*, 823 F.2d at 1203; *GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *5 (N.D. Ill. Jan. 5, 2015). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers*, 962 F.2d at 1266; *see also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."). "[P]roducing long lists of general areas of information which contain unidentified trade secrets" will not suffice. *AMP*, 823 F.2d at 1203. A plaintiff instead must "identify[ ] particular documents or other sources of information" reflecting its secrets, *ibid.*, and in doing so "separate the [alleged] trade secrets" from other, more generic information contained therein, *IDX*, 285 F.3d at 584.

Bosch contends that Maxtech's trade secret is the idea of combining all thirteen identified features in a single product. Doc. 152 at 21; Doc. 173 at ¶ 54. If so, that would be specific enough, but Maxtech disputes that characterization. Doc. 173 at ¶ 54. Maxtech's own view of its trade secret has been dizzyingly and frustratingly hard to pin down. Even after fully briefing Bosch's summary judgment motion, this was all the clarity Maxtech's counsel could offer:

THE COURT: Ms. Schmidt, what is the actual trade secret at issue for the inclinometer?

PLAINTIFF'S COUNSEL: Maxtech identified a number of components that kind of play into that, and the combination thereof constitutes a trade secret.

THE COURT: So, the combination of all 13 is a trade secret?

PLAINTIFF'S COUNSEL: Not necessarily.

THE COURT: Well, what could it be then?

PLAINTIFF'S COUNSEL: It could be, for example, six or seven out of the thirteen elements.

THE COURT: How about five?

PLAINTIFF'S COUNSEL: Perhaps five.

THE COURT: How about four?

PLAINTIFF'S COUNSEL: Perhaps four; probably not fewer.

Maxtech then seemed to say that only "substantial enough" features would count, but it declined to specify which particular features counted as substantial and which did not:

THE COURT: And so, is it any four, or is it four in particular—like, involving the rail or something like that?

PLAINTIFF'S COUNSEL: Probably any four.

THE COURT: Okay. Even the ones that are—that were publicly known at the time? There were six or so that were publicly known?

PLAINTIFF'S COUNSEL: In combination, perhaps. As individual features, probably not.

There are 17,160 different ways (13 x 12 x 11 x 10) to combine four of thirteen possible features. Apparently Maxtech intends to claim each such combination as a secret insight that it pioneered.

 If that really is the scope of Maxtech's claimed trade secret, it is fatally unspecific. *See AMP*, 823 F.2d at 1203 (affirming summary judgment on the ground that the plaintiff had "failed . . . to identify any particularized trade secrets," where the plaintiff rested its claim on a list of "hundreds of pieces of . . . internal information"). And even assuming that limiting the trade secret to some (much) narrower subset of combinations involving "substantial" features could render the

claimed secret adequately specific, the undisputed facts show that the GLM 50C would not fit the bill. Maxtech contends that "a detachable rail that the inclinometer could be locked in to for more accurate measuring" was a "[k]ey feature[ ]" of its prototype. Doc. 187 at ¶ 46. But the GLM 50C does not have a detachable rail. Doc. 173 at ¶ 55. Such a significant difference between the two products means that Maxtech's trade secret claim fails as a matter of law, given that it relies exclusively on the similarity of the two products as proof that Bosch's access to its information ripened into misappropriation. *See Composite Marine Propellers*, 962 F.2d at 1267–68 (holding that there was a "total failure of proof" on a trade secret claim where the plaintiff's and the defendants' products differed with respect to the technology at issue and the plaintiff adduced no other evidence that its confidential information influenced the defendants' design).

### B. Breach of Contract Claim

The parties agree that the contract claim fails if Bosch establishes that it did not use Maxtech's inclinometer trade secrets. Doc. 152 at 32; Doc. 172 at 46. For the reasons given above, Bosch has done so as a matter of law. Summary judgment therefore is granted on the contract claim.

### C. Fraud Claim

As noted, Maxtech claims that Bosch fraudulently misrepresented its interest in selling Maxtech's inclinometer, causing Maxtech to delay seeking other marketing channels to its competitive detriment. "A claim of common-law fraud under Illinois law requires proof of five elements: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's dam-

ages resulting from the reliance on the statement." *Massuda v. Panda Express, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) (internal quotation marks omitted). Insofar as a fraud claim relies on allegedly fraudulent omissions rather than affirmative misrepresentations, the plaintiff also must prove that a fiduciary or other special relationship existed between the parties. *See Weidner v. Karlin*, 402 Ill.App.3d 1084, 342 Ill.Dec. 475, 932 N.E.2d 602, 605 (2010) ("[I]n order to prove fraud by the omission of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak.") (internal quotation marks omitted); *Janowiak v. Tiesi*, 402 Ill. App.3d 997, 342 Ill.Dec. 442, 932 N.E.2d 569, 579 (2010).

Bosch contends that this is a case about misleading omissions, not outright lies. Doc. 152 at 34–35. In essence, Bosch argues that Maxtech's fraud claim hinges on its failure to notify Maxtech that it was independently developing its own inclinometer product. *Id.* at 33. If so, the claim would fail; these were two companies engaged in an arm's length business deal as two independent contractors, so it is undisputed that they had no special or fiduciary relationship. Doc. 173 at ¶ 117; *see Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F.Supp.2d 933, 946 (N.D. Ill. 2013) ("[O]rdinarily in a business transaction each party guards his own interests and no fiduciary duty exists.") (alteration in original). Maxtech, however, disputes the premise that Bosch merely failed to inform Maxtech of its other plans; it contends that the record contains evidence of several affirmative misrepresentations made by Angus on behalf of his employer, Bosch Tool. Doc. 172 at 46–48.

Maxtech is correct. First, there is Angus's statement on December 13, 2011, "Yes, I got the digital level, I will play with

this for a while before sending to Germany." Doc. 187 at ¶ 59. This statement was a lie—Angus never sent the prototype anywhere, and a reasonable jury could conclude that he never intended to. *See AAR Int'l, Inc. v. Vacances Heliades, S.A.*, 202 F.Supp.2d 788, 798–99 (N.D. Ill. 2002) ("One ... manifestation of fraudulent intent is a breach that follows so close on the heels of the promise that the intent not to keep the promise may be inferred."). Second, there is Pelham's 2011 memo, from which a reasonable jury could conclude that Angus told Pelham that he had in fact sent the sample to Germany, when he had not. Finally, there is Angus's November 2011 statement, "[T]o get [Maxtech's inclinometer] approved, [Bosch Tool] need[s] to get Germany's approval," as well as his related statement, when informing Maxtech of Bosch's decision not to proceed, "As I mentioned previously, lead for this category is in Germany." Doc. 187 at ¶ 65. This is evidence that Angus told Maxtech that the decision whether to proceed with selling Maxtech's inclinometer rested with Bosch GmbH officials in Germany, when Angus in fact later admitted that he was always the sole decisionmaker. These record materials would allow a reasonable jury to conclude that Angus—and thus his employer, Bosch Tool—affirmatively misled Maxtech about whether Angus intended to, and did, send its inclinometer prototype to Germany, as well as about who would be the decisionmaker on the product. These lies, in turn, could be viewed as creating a false impression that Bosch was seriously considering doing business with Maxtech, when in fact it was not.

That does not end the matter, for Maxtech's fraud claim survives only if it also could prove to a jury that Bosch Tool intended to induce Maxtech to rely on its misrepresentations—in this case, that Bosch Tool intended for Maxtech to delay pursuing other avenues for marketing its inclinometer product. *See Massuda*, 759 F.3d at 783 ("A claim of common-law fraud under Illinois law requires proof of ... (3) defendant's intent that the statement induce the plaintiff to act ....") (internal quotation marks omitted). Bosch argues that there is no evidence that Angus's misrepresentations were intended to induce Maxtech to bring its competing product to market later than it otherwise would have. Doc. 152 at 37–38. But what reason could Angus have had for leading Maxtech to believe that Bosch was actively considering Maxtech's offer when it was not, other than an expectation that doing so would cause Maxtech to delay market entry? Even if Maxtech unilaterally offered to hold its inclinometer exclusive for Bosch and "Bosch never requested or agreed to any exclusivity," Doc. 152 at 37, that does not mean that Bosch Tool did not stand to benefit from encouraging Maxtech's bootless pursuit of a deal. A reasonable jury could conclude that Angus interspersed a few choice lies with long stretches of strategic silence, and that his goal in doing so was to keep Maxtech at the (one-sided) bargaining table—and thus out of the inclinometer market—as long as possible.

Finally, Maxtech must show that its reliance was reasonable under the circumstances. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 645 (7th Cir. 2002) ("[W]e must also consider whether [the plaintiff]'s reliance on [the defendant]'s representations ... was justifiable, as required for a suit for fraud to succeed."); *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 114 Ill.2d 278, 102 Ill.Dec. 306, 499 N.E.2d 1319, 1323 (1986) ("[T]he reliance upon the misrepresentation must have been justified, *i.e.*, the other party had a right to rely upon the statement."); *Miller UK Ltd. v. Caterpillar, Inc.*, 2015 WL 6407223, at *5 (N.D. Ill. Oct. 21, 2015). Bosch argues that Maxtech could not reasonably have relied on Bosch's failure to inform Maxtech that it

was developing a competing product, because the 2009 NDA expressly contemplated that Bosch might independently develop competing products and also contained an integration clause providing that the NDA was "the entire understanding between the parties." Doc. 152 at 35–37; Doc. 186 at 15–16. Bosch's argument misses the point, as its mere failure to inform Maxtech of its plans is not the issue. Maxtech has identified *affirmative* misrepresentations that Angus made, and the question is whether Maxtech could reasonably have relied on *those* when it continued to hold its inclinometer exclusive for Bosch and delayed pursuing alternative channels for bringing it to market.

Bosch makes no argument as to why Maxtech's reliance on Angus's affirmative representations could have been unreasonable, thus forfeiting the point. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The nonmoving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument . . . but also to a litigant's failure to advance a specific point in support of a general argument . . . ."). The closest Bosch gets is a passing statement in its reply brief, contending that "where the parties have entered into a contract with an integration clause (as here), courts have found it unreasonable as a matter of law for one party to rely on the other's oral representations." Doc. 186 at 16. That undeveloped argument is insufficient to avoid forfeiture. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Any such argument would have failed in any event. Integration clauses do not erect a categorical bar to fraud claims. *See Vigortone*, 316 F.3d at 644 ("[F]raud is a tort, and the parol evidence rule is not a doctrine of tort law and so an integration clause does not bar a claim of fraud based on statements not contained in the contract."). And a jury could properly conclude that Maxtech reasonably relied on Angus's false representations when it left the exclusivity offer on the table and awaited Bosch's response before taking its product elsewhere. *See LoggerHead Tools, LLC v. Sears Holding Corp.*, 19 F.Supp.3d 775, 782 (N.D. Ill. 2013) (holding that the plaintiff, a product manufacturer, reasonably relied on the pendency of negotiations with the defendant, a retailer, where the "negotiations were simply a sham to prevent [the plaintiff] from selling to [the defendant]'s competitors").

In sum, because Maxtech has adduced evidence that would allow a jury to find that Angus made affirmative misrepresentations on behalf of Bosch Tool, that Angus intended for Maxtech to delay entering the market in reliance on those representations, and that Maxtech reasonably relied on them in so doing, Maxtech's fraud claim survives summary judgment.

Bosch next argues that even if the fraud claim can proceed against Bosch Tool, Maxtech has failed to adduce any evidence that would support holding Bosch GmbH liable for Angus's misrepresentations. Doc. 152 at 39. This is correct. Angus testified that he never discussed Maxtech or its prototype with anyone in Germany. Doc.

173 at ¶ 73; Doc. 174–10 at 27–28; Doc. 187 at ¶¶ 68, 69. Füllemann, the Bosch GmbH executive involved with the GLM 80 project, likewise avers that he never discussed Maxtech or its inclinometer with anyone from Bosch Tool. Doc. 173 at ¶ 74.

Maxtech has not adduced direct evidence that any communications about its inclinometer actually took place between Bosch Tool and Bosch GmbH, but it argues that such communications must have occurred, giving four reasons. First, Maxtech contends that Angus's testimony on this point is not credible, asserting that he lied several times, including about whether he sent the prototype to Germany and about whether the decision not to work with Maxtech was made by a team or just him. *Id.* at ¶¶ 73, 127. Second, Maxtech submits that Füllemann's testimony cannot be believed because Angus told Maxtech that Angus in fact had discussed its prototype "in Germany." *Id.* at ¶¶ 74, 127. Third, Maxtech argues that Bosch GmbH must have known about Maxtech's prototype because several of its features appear in in Bosch's inclinometer products. *Ibid.* Fourth, Maxtech argues that because Angus had regular contact with Füllemann—including visiting Germany at least twice per year and discussing inclinometers and the GLM 80 with Füllemann in person—Maxtech and its inclinometer *must* have come up at some point or another. *Id.* at ¶¶ 74, 127; Doc. 187 at ¶ 70.

None of these arguments has merit. The first two are irreconcilably at odds with each other; the first rests on the premise that Angus is a liar, and the second on the premise that he tells the truth. And the second is flawed on its own terms: it requires treating as true a statement whose falsehood is a premise of the alleged fraud. In any event, disbelieving Angus and Füllemann would just leave an absence of evidence on whether Maxtech's inclinometer was ever discussed between Bosch Tool and Bosch GmbH, and an absence of evidence cannot forestall summary judgment. *See Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (holding that the movant may prevail on summary judgment by demonstrating "an absence of evidence to support the nonmoving party's case"). The third and fourth arguments ask the court to draw unreasonable inferences. Maxtech has not adduced evidence that any individual feature of its prototype was unique or secret—and common sense suggests otherwise for several of them—so there is no reasonable basis for inferring that Bosch GmbH was aware of Maxtech's prototype simply because the two companies' products share some features. There is also no basis for presuming that Maxtech's inclinometer would have been on the agenda during Angus's visits to Germany just because those visits happened. There is no evidence—documentary or testimonial—to that effect, and there is testimony from Angus and Füllemann to the contrary. This dearth of evidence leaves only pure speculation to support Maxtech's claim that Bosch Tool and Bosch GmbH discussed Maxtech's inclinometer, and that is not enough to preclude summary judgment. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Dorsey v. Morgan Stanley*, 507 F.3d 624, 628 (7th Cir. 2007) (holding that it would be "simply too speculative" to infer that a supervisor directed his subordinate's conduct, where the subordinate testified that she acted independently and the only contrary evidence was the fact that the subordinate acted shortly after meeting with the supervisor).

The record therefore does not support the proposition that any such conversations occurred. And even if it did, it would be an unreasonable inferential leap to con-

clude that Füllemann of Bosch GmbH knew Angus of Bosch Tool was misleading Maxtech about Bosch's interest. It then would be an unreasonable inferential leap further still to conclude that Füllemann directed or participated in the fraud. Bosch Tool had its own motive to want Maxtech sidelined during the relevant time period, independent of keeping Maxtech out of the European market; recall that the GLM 80 debuted in North America sometime in the second half of 2011. A reasonable jury therefore could not conclude that Bosch GmbH was involved in the alleged fraud. The fraud claim may proceed only against Bosch Tool.

## III. Shell Pack Claims

With regard to the shell pack project, Maxtech claims that Bosch misappropriated details of its process and used them in Bosch's own cocoon packaging process. Maxtech also claims that, in so doing, Bosch breached the 2009 NDA.

### A. Trade Secrets Claim

Bosch makes three arguments for summary judgment against Maxtech's trade secrets claim. First, it contends that Maxtech has failed to identify its alleged trade secrets with sufficient specificity. Doc. 152 at 25–26. Second, it contends that no reasonable jury could conclude that Maxtech adequately protected its secrets. *Id.* at 26–28. Finally, it contends that no reasonable jury could conclude that Bosch actually used the alleged trade secrets. *Id.* at 28–30. All three arguments lack merit.

*1. Specificity.* Bosch argues that Maxtech has failed to satisfy its obligation—discussed above as a basis for granting summary judgment on the inclinometer trade secrets claim—that it define its alleged shell pack trade secrets with adequate specificity. As mentioned, the plaintiff must "identify[ ] particular documents or other sources of information"

reflecting its secrets, *AMP*, 823 F.2d at 1203, and in so doing must "separate the [alleged] trade secrets" from other, more generic information contained therein, *IDX*, 285 F.3d at 584.

Maxtech did not cover itself in glory explaining the relevant packaging technology to the court, but—with some prodding by Bosch—it has nevertheless cleared the bar. The parties spilled considerable ink during discovery to narrow down precisely what aspects of the shell packaging Maxtech claims are trade secrets used by Bosch. Docs. 85, 109. In the end, Maxtech rests its claim upon several paragraphs of the Pendergraph patent applications relating to the cocoon technology, corresponding paragraphs of its own patent application, and an interrogatory response that, when read in conjunction with those patent applications, clarifies precisely which specifications of the described processes were secret. Doc. 173 at ¶ 76.

Some supplemental background on the relevant patent applications is necessary to make sense of these materials. The Bosch/Pendergraph applications and the Maxtech application described similar, but not identical, processes for creating and assembling packaging, each staking their claim to novelty on having solved a different problem. The Bosch patent applications claim to set forth an improvement over existing plastic-on-cardboard technology. Doc. 105–1 at 8; Doc. 105–2 at 8. Namely, they claim that existing technologies relied on one or two pre-formed molds to shape the plastic half of the packaging into the desired shape, while Bosch's process made it possible to use the product itself to shape the plastic around it. Doc. 105–1 at 2, 8; Doc. 105–2 at 2, 8. Maxtech's application focused on the benefits Bosch originally tasked it with achieving: the ability to create all-plastic packaging and to embed a security tag. Doc. 105–3 at 11.

But there was one key similarity: like Bosch's process, Maxtech's process relied on the product itself to shape the top layer of plastic around the product itself. *Ibid.*

The portions of both Bosch's and Maxtech's patent applications highlighted by Maxtech are those relating to that common feature: positioning a product-to-be-packaged under a sheet of plastic, then using a combination of heat and vacuum technology to heat and mold (or "thermoform") that sheet over the product. *Compare* 105–1 at 9 (Bosch's patent application, describing a process in which "[t]he products ... are supported on a fixture ... in the thermoforming station," at which point pressure—potentially generated by vacuum—"is used to cause the film to surround and closely conform to the products"), *and* Doc. 105–2 at 8–11 (same), *with* Doc. 105–3 at 12 (Maxtech's patent application, describing "Step 1, position product on a holding fixture," and "Second step, heating a first layer of thermoplastic and positioning the fixture with product under the first layer, and applying a vacuum to the fixture to pull the first layer of thermoplastic onto the product"). Although the patent applications standing alone do not clarify which aspects of this part of the process were secret, Maxtech's interrogatory response explains that "Maxtech's trade secrets ... include the settings and timings of the machine that is used to perform the bonding process," "modifications to the heating system and temperature settings used during the manufacturing process," and other similarly concrete specifications of the process. Doc. 127–1 at 9. Maxtech's interrogatory response explains that the settings it perfected gave it proprietary insight into "how to pre-print [certain types of] skin filaments" and "how to apply pre-heat form of those materials for bonding and high frequency welding while preventing distortion of any pre-printed graphical images." *Ibid.* For example, Maxtech explains: "After much trial,

error and testing, Maxtech discovered preprinted materials did not need to be heated to full pliability but did need to have radiant heat applied to a minimum of 1 x 10 ohms per square inch of material for a time frame of 4 seconds before coming into contact with the product and the mating side. When PVC, PP, PET materials were heated any greater than these settings, the results were graphical artwork failure (distortion) or brittleness." *Ibid.* Overall, the interrogatory response describes a manageable number of specific secrets relating to the process set forth in the patent applications.

*IDX Systems Corp. v. Epic Systems Corp., supra,* is instructive is deciding whether Maxtech described its shall packaging trade secrets with the requisite specificity. There, the plaintiff's 43–page description of the software at issue failed to "separate the trade secrets from the other information that goes into any software package," leaving "mysterious exactly which pieces of information are the trade secrets." 285 F.3d at 583–84. In rejecting the trade secret claim, the Seventh Circuit held that "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id.* at 584.

Maxtech has gone several steps further than the *IDX* plaintiff to identify specific trade secrets. By highlighting portions of the patent applications, Maxtech indicated which particular aspects of Bosch's process overlapped with its own, and its interrogatory response explains which specifications and settings it learned through trial and error would yield the best possible results. The list of various such details may have *other* shortcomings; for example, Maxtech may have difficulty establishing that Bosch used its insights into the process of "high-frequency welding" if that process is rele-

vant only to plastic-on-plastic packaging technology, which there is no evidence Bosch ever used. But it is sufficiently concrete and comprehensible to withstand Bosch's *specificity* challenge.

Many of Bosch's arguments are leveled at the language of the patent applications considered in isolation, without the clarification provided by the interrogatory response. Noting that the patent applications describe a process for thermoforming "a rigid or semi-rigid film," Bosch contends that Maxtech "has not provided any specificity regarding how [rigid] the film should be, what type of pressure is used, and what temperature is suitable." Doc. 186 at 22. But Maxtech's interrogatory response clarifies which of these were purportedly secret: the temperatures and its particular methods for applying pressure via vacuum, but not any particular rigidity of the plastic. Doc. 127–1 at 9–10 (identifying, *e.g.,* "heating temperatures and vacuum times" and the "amount of vacuum needed to ensure effectiveness of sealing/bonding" as among its trade secrets). And none of the cases cited by Bosch come close to suggesting that Maxtech needs to identify the specific temperatures at issue; explaining that it was the optimal temperatures— whatever those were—that Bosch allegedly misappropriated is specific enough for the purposes of a identifying a trade secret. *See Composite Marine Propellers,* 962 F.2d at 1266 (holding that "the record supports a conclusion that the flex of [the plaintiff]'s product [was] [its] trade secret," where the alleged trade secret was "the optimal degree of flex, discovered by dint of . . . research," but the plaintiff did not specify what particular degree of flex was optimal).

 *2. Confidentiality.* Next, Bosch contends that Maxtech has not shown that it kept information about its shell pack process confidential, as required by the 2009 NDA. Doc. 152 at 26–28. "[A] con-

tract that defines the degree of confidentiality among the parties also serves to establish—and to define—the duty of confidentiality required to underpin an [ITSA] claim." *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.,* 542 F.Supp.2d 849, 865 (N.D. Ill. 2008) (second alteration in original); *see also Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1118 (Fed. Cir. 1996); *Nilssen v. Motorola, Inc.,* 963 F.Supp. 664, 680 (N.D. Ill. 1997). Because the 2009 NDA required Maxtech to mark any secret information "Confidential" or "Proprietary" when disclosed in writing, or to give similar written notice within thirty days after oral or visual disclosures, such written designations were "a necessary (but not . . . sufficient) condition of a possible trade secret claim" regarding the information in question. *Fast Food Gourmet,* 542 F.Supp.2d at 865; *see also Nilssen,* 963 F.Supp. at 680 n.17. Whether a trade secret plaintiff satisfied its obligation to preserve secrecy generally is a question of fact. *See Learning Curve Toys,* 342 F.3d at 725 & n.3 (collecting cases). So the issue here is whether Maxtech has adduced evidence from which a reasonable jury could conclude that its disclosures were accompanied by the required written notice of confidentiality.

 Bosch's argument hinges on what is *not* in the record: any particular document that Maxtech passed to Bosch containing the secrets that Maxtech claims were misappropriated, or any document memorializing the oral disclosure thereof. Doc. 152 at 27. Maxtech therefore can point to no document that *both* evidences the disclosure of its trade secrets *and* bears the requisite confidentiality markings. But Maxtech has adduced evidence that it orally and visually disclosed the details of its shell pack processes to Pendergraph and an unnamed Bosch employee during visits to Maxtech's shell pack

facility. Doc. 187 at ¶ 28. And Maxtech has separately adduced multiple documents relating to those visits—such as powerpoint presentations and emails regarding the shell pack project—bearing indications that the subject matter thereof was confidential. Doc. 173 at ¶¶ 89, 92; *see* Doc. 175-6 (email to Pendergraph attaching a presentation about shell pack to be given during a February 6, 2012 meeting, with "Sensitivity: Confidential" in the header); Doc. 175-7 (presentation concerning the shell pack project dated February 6, 2012, entitled "Welcome Robert Bosch Group to Saki / Maxtech; Mr. Allen Pendergraph," with each page marked "This Presentation is the Property of Maxtech and should be used for the purpose it was intended for. Copying or transmitting to other persons should be done with a written permission from Maxtech"); Doc. 175-8 (emails between Pendergraph and Pelham regarding the shell pack project, with "Sensitivity: Confidential" in the header); Doc. 175-11 (email to Pendergraph from Pelham regarding the shell pack project, with "PRIVATE!!" in the subject line and "Sensitivity: Confidential" in the header). A reasonable jury could draw the inference that, for the disclosures made orally or visually during Pendergraph's visits, Maxtech "identified [that information] as Confidential Information in writing … within thirty … days after the disclosure," as required by the 2009 NDA. The reasonableness of such an inference is reinforced by Pendergraph's testimony that he understood the project to be confidential. Doc. 173 at ¶¶ 86, 113; Doc. 174 at 11.

Bosch's only affirmative evidence to the contrary is the testimony of a single Maxtech engineer, Ashwani Kapur—apparently speaking generally and not about the shell pack project in particular—that Maxtech's policy of labeling documents "confidential" when sharing them with outside parties was "not very seriously followed."

Doc. 152 at 27; Doc. 173 at ¶ 89. But that does not compel the jury to draw the inference that those procedures were not followed with respect to the specific disclosures at issue here, especially given that Maxtech has adduced evidence that communications relating to *this* project *were* marked confidential. In any event, the context of Kapur's testimony suggests that he was referring to exchanges of information more informal than Pendergraph's facility visits. Doc. 130-8 at 3-4 ("There were times yes, confidential was written, especially in the drawings, but sometimes when you are having a discussion and some sketches or something were shared, there could be instances when it might have got missed."). A reasonable jury thus could (though need not) conclude that Maxtech accompanied its oral and visual disclosures of proprietary details of its shell pack process with sufficient written notice of the project's confidentiality.

After Maxtech responded to Bosch's summary judgment motion, Bosch switched gears and attempted to argue that Maxtech has not adduced evidence that it disclosed its secrets to Bosch *at all*—with or without the required confidentiality designations. Doc. 186. This argument was not made in Bosch's opening brief, which focused only on the confidentiality of any disclosures. Doc. 152 at 26-28. Bosch accordingly has forfeited the point. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

The argument fails on the merits in any event. Maxtech may not have adduced doc-

umentary evidence reflecting the disclosure of particular secrets—such as the specific temperature setting for a certain step of its process—but a reasonable jury could infer that Bosch was able to glean such details during Pendergraph's visits to Maxtech's facility. In particular, Kapur, who was present during the visits, testified that during one of them, a Bosch packaging expert "reviewed very critically all the processes," and that when Pendergraph came, "all the steps" were explained to him. Doc. 174–1 at 3–5.

*3. Use.* Finally, Bosch contends that Maxtech has failed to adduce evidence that Bosch used the secrets it supposedly learned about Maxtech's shell pack process, since Bosch deemed plastic-on-plastic packaging too costly and abandoned the idea shortly after bringing the packaging project in-house. Doc. 152 at 28–30. Maxtech responds by pointing to evidence, discussed below, that it believes creates a factual dispute. Doc. 172 at 42–44. Maxtech also correctly notes that Bosch need not appropriate its process *in toto* to misappropriate it for purposes of trade secret law—it would suffice if Bosch used Maxtech's insights as a jumping off point or catalyst for its own development of a similar product. Doc. 172 at 43; *see Mangren Research & Dev. Corp. v. Nat'l Chem. Co.,* 87 F.3d 937, 944 (7th Cir. 1996) (holding that, under Illinois law, "the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret"); *Composite Marine Propellers,* 962 F.2d at 1266 (noting that, although "[i]t [was] undisputed that [the defendant's product] uses a flex that differs from [the plaintiff]'s products," the plaintiff could have argued "that defendants learned from [its] experiments just which differences would be improvements"); *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.,* 940

F.Supp. 1300, 1308 (N.D. Ill. 1996) ("Although a product appears to be a new or modified product, a violation of the ITSA occurs if the modification or new product was substantially derived from another's trade secret.").

This argument turns on a factual dispute that must be left to a jury. In Maxtech's telling, Bosch Tool learned the details of Maxtech's shell pack process and disclosed them to Bosch GmbH, which used that information to develop and refine its own packaging process. Doc. 173 at ¶¶ 81–82. Maxtech believes that Bosch changed the name of its project from "shell pack" to "cocoon" but continued relying on at least some of the methods Maxtech developed, and therefore that Bosch's current "cocoon" packaging grew directly out of Maxtech's efforts. Doc. 173 at ¶ 102; Doc. 187 at ¶ 31. As evidence, Maxtech points to an August 2014 email from McPhee, a Bosch Tool project manager for the packaging project, to himself, with the subject line "History of Cocoon." Doc. 174–3 at 2. It read, in part:

- 2011–April 2012 Shell Pack for NA
 - EDP–NA worked with buyout supplier (Maxtech) as subcontractor to begin development of concept.
 - Manual process—multi-station process.
 - Concerns over legality/patents, etc having Maxtech completing the development.
 - EMP likes the concept, we decide to bring development in-house (more protected). DB13 put together to review "global" impact and development.

- July 2012 DB13 *Turns into code name "Cocoon"*

*Ibid.* (emphasis added); Doc. 187 at ¶ 31. In the same vein, Pendergraph testified

that "shell pack" and "cocoon" were "the same project." Doc. 174 at 20; Doc. 187 at ¶ 31.

Moreover, Maxtech has adduced evidence that the Pendergraph patents, which allegedly incorporate aspects of Maxtech's process, describe the current cocoon packaging process. Internal Bosch documents referred to the new cocoon packaging as "patented" or "patent pending," and that the Pendergraph patents were the only packaging patents Bosch sought around that time, at least in the United States. Doc. 187 at ¶¶ 37–38. In addition, there is Pendergraph's testimony that Bosch took the unusual step of asking him to sign patent applications bearing his name even though he did not author them, which could suggest that the applications did not reflect Bosch's own work.

In response, Bosch points to the ways in which its current cocoon packaging differs from Maxtech's shell pack packaging. In particular, Bosch notes that the twin goals of Maxtech's project were to develop plastic-on-plastic packaging that would be 100% recyclable and could incorporate a North American security tag within the packaging itself. Bosch's cocoon packaging, by contrast, affixes one plastic layer to a backing made of coated paper, Doc 154–10 at 6, 11–12; Doc. 173 at ¶¶ 24, 96, and it also applies the security tag to the back of the paperboard, not within the plastic, Doc. 154–9 at 3–4; Doc. 154–10 at 5, 13; Doc. 173 at ¶ 24. Maxtech does not dispute that these were the major goals of the packaging process Bosch tasked it with creating, nor does it rebut the evidence that Bosch's product lacks those key features. Doc. 173 at ¶¶ 23–24.

But none of Bosch's evidence contradicts Maxtech's evidence that Bosch used Maxtech's technology, because—as previously discussed—the bulk of the secrets Maxtech has identified dealt with the process for thermoforming the first layer of plastic

around the product itself. Those steps are common to both the shell pack process and the cocoon process, as allegedly described in the Pendergraph patents, because both styles of packaging require one plastic sheet that is shaped around the product in question. So a jury reasonably could infer that knowledge of the settings Maxtech optimized while attempting to create plastic-on-plastic packaging proved useful to Bosch in developing its process for producing that first molded layer of plastic. This could be true even though Maxtech's process as a whole, including the steps that involved sealing that first layer of plastic to a second, ultimately proved cost-prohibitive.

Admittedly, Maxtech's evidence requires the jury to infer Bosch's use of its secrets from: (1) Bosch witnesses' general statements that the shell pack and cocoon projects were the same project; (2) evidence that the Pendergraph applications both (a) relate to the cocoon packaging and (b) share common elements with the Maxtech patent application; and (3) Bosch's access to—and apparent interest in—the details of Maxtech's process during its visits to Maxtech's facility. But Illinois trade secrets law permits use to be inferred in such a manner. *See Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) (holding that a showing of "access and similarity ... may support a trade secret misappropriation claim" under Illinois law); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1429 (7th Cir. 1994) ("While there was no direct evidence that anyone at [the defendant] used [the plaintiff's] confidential information in the making of its own [product], the jury apparently inferred from the fact that [the defendant] had access to [the plaintiff's] confidential information and from the similarity between the two devices that [the defendant] misappropriated [the plaintiff]'s trade se-

cret and that the [defendant's product] was derived from that trade secret."). Maxtech has therefore adduced sufficient evidence from which a reasonable jury could conclude that Maxtech's secrets were at least a helpful jumping-off point for Bosch's cocoon packaging. *Mangren*, 87 F.3d at 944; *Thermodyne*, 940 F.Supp. at 1308.

One final note: Maxtech's interrogatory response makes clear that it is describing multiple "trade secrets" relating to various aspects of its shell pack process. Doc. 127–1 at 9–10. For unclear reasons, however, Bosch's summary judgment motion proceeded on the premise that Maxtech alleged a single "combination trade secret," Doc. 152 at 28, and so it argued the issue of use on an all-or-nothing basis. It would behoove both parties to narrow the universe of shell pack secrets further in advance of trial. Although Maxtech has survived summary judgment by adducing evidence from which a jury could conclude that Bosch used at least *some* of the secrets it identified, Maxtech has also identified some secrets that sound to the court's (admittedly untrained) ear like they cannot not be relevant to plastic-on-paperboard packaging like Bosch now uses. For instance, the "high frequency welding processes" referred to in Maxtech's interrogatory response, Doc. 127–1 at 10, seem to be a way of getting two or more sheets of plastic to adhere to one another. So it is unclear how Bosch, which did not end up proceeding with plastic-on-plastic packaging, could have used that particular secret. Moreover, Maxtech's summary judgment briefing seems to signal that it is prepared to concede that Bosch did not use some of the secrets it identified. For example, Maxtech stated in its interrogatory response that "the blend of inks and type of plastic filaments" were among its trade secrets, but its briefing abandoned that claim. Doc. 172 at 42; Doc. 173 at ¶ 80. There may be additional common ground here, and by identifying it promptly the parties can minimize jury confusion at trial.

## B. Breach of Contract Claim

As with the inclinometer and spade bit claims, the parties agree that Maxtech's shell pack breach of contract claim is coextensive with its shell pack trade secrets claim. Doc. 152 at 32–33; Doc. 172 at 46. Because Maxtech has established a triable issue with respect to its shell pack trade secrets misappropriation claim, its breach of contract claim may proceed to trial as well.

## Conclusion

For the foregoing reasons, Bosch's summary judgment motion is granted as to all of Maxtech's spade bit claims, Maxtech's inclinometer trade secrets and breach of contract claims, and the inclinometer fraud claim against Bosch GmbH. The inclinometer fraud claim against Bosch Tool and the shell pack claims against both Bosch entities will proceed to trial.